IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS SISNEROS,

         Plaintiff,

vs.                                                                          No. CIV 09-0213 JB/ACT

MICHAEL FISHER, in his individual capacity,
and THE COUNTY OF BERNALILLO,

         Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed November 12, 2009 (Doc. 35). The Court held a hearing on December 31, 2009. The primary issues are: (i) whether Plaintiff Dennis Sisneros has shown that Defendant Michael Fisher violated his Fourth and Fourteenth Amendment rights by unlawfully seizing Sisneros and using excessive force; (ii) whether the rights that Sisneros accuses Mr. Fisher of violating were clearly established at the time of the alleged violation; and (iii) whether Sisneros has shown a genuine issue of fact to support his state-law claims. Because the Court determines that disputed facts make the difference between reasonable suspicion and a lack of reasonable suspicion, and that the facts for which Sisneros provides evidence support most of his causes of action, the Court denies Mr. Fisher's and Defendant County of Bernalillo's motion for summary judgment in part. The Court grants the motion as to Sisneros's excessive-use-of-force claim under the United States Constitution because he has failed to provide evidence of an actual injury that is not de minimis.

## FACTUAL BACKGROUND

The parties concede that there are undisputed material facts and that there are disputed facts.

The issue is whether the disputed facts are material.  The Court will, as it must, view the evidence in the light most favorable to the non-moving party.  See Harman v. Pollock, 586 F.3d 1254, 1268 (10th Cir. 2009)("When applying a summary judgment standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.")(quoting Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999))(alterations omitted).

**1.      Sisneros's Story.**

According to his Complaint, Plaintiff Dennis Sisneros was visiting a friend in the Southeast Heights of Albuquerque, New Mexico on June 17, 2007.  See Complaint for Civil Rights Violations, Tort Claims and Damages ¶ 9, at 2, filed March 5, 2009 (Doc. 1-2)("Complaint").  Sisneros was accompanied by his two  young daughters and a friend, David Trujillo.  See Complaint ¶ 10, at 2. At some point, Trujillo left the other three and proceeded to walk south on the west side of Juan Tabo Boulevard, toward Central Avenue.  See id. ¶ 11, at 2.  Sisneros, still on the east side of the street, thought Trujillo had walked off with his keys, so Sisneros began to jog to catch up to Trujillo, calling out to Trujillo as he crossed Juan Tabo.  See id. ¶¶ 12-14, at 2.  When Sisneros reached the west side of Juan Tabo, where Trujillo was, he continued jogging to catch up.  See id. ¶ 15, at 3. Before Sisneros reached Trujillo, however, he was approached by a man holding a gun, ordering him to get on the ground.  See id. ¶ 16, at 3.  Being unarmed and thinking that the armed man was robbing him, Sisneros complied and got on the ground.  See id. ¶ 17, at 3.  After identifying himself as a Bernalillo County Sheriff's Officer, Mr. Fisher allegedly pointed his gun at Sisneros's head, got on top of Sisneros, pinned his arms, and eventually handcuffed him.  See id. ¶ 19-20, at 3.[1]

---

[1] This paragraph reflects the allegations of the Complaint.  The Defendants contest some of Sisneros's allegations of facts, particularly those in the last two sentences.

1.      **Potential Witnesses.**

On the evening of June 17, 2007, before 8:15 p.m., John Sanchez was traveling in his convertible automobile with the top down to the convenience store near his home to purchase soft drinks.  See Deposition of John Sanchez at 6:13-9:15 (taken October 26, 2009), filed November 12, 2009 (Doc. 36-5)("Sanchez Depo.").  As he pulled up to the store, he observed two males near the pay telephone at the store.  See Sanchez Depo. at 6:13-9:15 (Doc. 36-5).[2]  One male appeared to be trying to use the telephone.  See id. (Doc. 36-5).  The second male, who was shirtless and had tattoos, was yelling at the first individual and "yelling, screaming, going crazy."  Id. (Doc. 36-5).  Sanchez felt uncomfortable with the situation and left the parking lot of the convenience store without going into the store.  See id. (Doc. 36-5).

Sanchez later identified the tattooed man who had been screaming at the other man in the convenience store parking lot as Sisneros.  See Sanchez Depo. at 12:15-21 (Doc. 36-5).  Sisneros does not dispute that Sanchez testified that he believed Sisneros to be the same man whom he saw in the convenience store's parking lot screaming at another man on the pay telephone, but disputes that Sanchez correctly identified Sisneros as that same man.  Sanchez testified that, when he pulled up to the store, a large Anglo man with his shirt off was yelling at a smaller Anglo man who was on the telephone.  See Sanchez Depo. at 7:9-8:11 (Doc. 36-5); id. at 14:22-25 (Doc. 40-3); id. at 15:9-17 (Doc. 40-3); id. at 16:6-11 (Doc. 40-3).  Sanchez testified that the large Anglo man had tattoos on his chest.  See id. at 15:18- 16:9 (Doc. 40-3).

Also before the arrest of Sisneros, Tena Bloom had seen the two men and went to look over

_____

[2] Because the Court has received different select pages of the various depositions from each side, the Court will include the document number whenever it cites to deposition testimony so that it is clear which side's filing contains that excerpt.

the wall of her property to see if they were going to have a fight.  See Deposition of Tena Bloom at

33:8-21 (taken October 26, 2009), filed November 21, 2009 (Doc. 36-6)("Bloom Depo.").  Sisneros

contests the implication that the people that Bloom saw were the same people that Sanchez saw.

See Plaintiff's Response to Defendants' Motion for Summary Judgment ¶ 5, at 3, filed November

30, 2009 (Doc. 40).  Sisneros points to numerous pieces of Bloom's testimony where it is clear that,

although Bloom looked toward Sisneros and Trujillo to see if there was going to be a fight, what she

saw and heard made it clear that there would not be a fight.  See Bloom Depo. at 42:2-46:10 (Doc.

40-4)(testifying that, inter alia, the yelling was "like friend yelling," that she had not "seen them in

a heated argument that would lead [her] to believe they were going to fight," and that "at no point

. . . did [she] think they were going to be in a fight.").  On the other hand, Ali Suleiman, an

employee at the convenience store, testified by affidavit that Bloom told him that she had seen

Sisneros arguing and fighting with another man before his arrest.  See Affidavit of Suleiman ¶ 6, at

1 (dated October 26, 2009), filed November 12, 2009 (Doc. 36-7); Defendants' Brief ¶ 6, at 2.

　　　　2.　　**Disputed Facts: Sisneros's Encounter With Mr. Fisher.**

On June 17, 2007, at approximately 8:15 a.m., Mr. Fisher was off duty and returning home

in his privately owned vehicle from celebrating Father's Day with his parents.  See Supplemental

Report of Deputy M. Fisher at 1 (dated June 17, 2007), filed November 12, 2009 (Doc. 36-

2)("Report"); Deposition of Michael Fisher at 10:10-11:13 (taken August 12, 2009), filed November

12, 2009 (Doc. 36-3)("Fisher Depo."); Deposition of Mia Fisher at 4:2-18 (taken August 21, 2009),

filed November 12, 2009(Doc. 36-4)("Mia Fisher Depo.").  Mr. Fisher contends that he was riding

in the passenger seat of his vehicle with his wife, Mia, driving.  See Fisher Depo. at 10:14-11:13

(Doc. 36-3).  Sisneros disputes that Mr. Fisher was riding in the passenger seat.  See Deposition of

Emily Espinosa at 25:1-6 (taken August 13, 2009), filed November 30, 2009 (Doc. 40-2)(testifying

that she saw Fisher get out of the driver's side of his vehicle)("Espinosa Depo."); Sanchez Depo. at 10:23-11:1 (Doc. 36-5)(testifying that Fisher was on the driver's side). In any case, the Fishers' two young children were riding in the back seat. See Fisher Depo. at 10:14-11:13.

As the Fishers' vehicle approached the intersection of Juan Tabo and Horseshoe Trail, Mr. Fisher saw a man in jeans and a black shirt -- later identified as Trujillo -- walking northbound on the west side of Juan Tabo. See Report at 1. At that time, another man -- later identified as Sisneros -- ran from the east side of Juan Tabo at Horseshoe Trail to the west side of the street, yelling to the man in the black shirt. See id. at 1; Fisher Depo. at 12:5-13:20 (Doc. 36-3); Mia Fisher Depo. at 4:19-5:15 (Doc. 36-4); id. at 26:4-27:9; Deposition of Dennis Sisneros at 41:18-43:2 (taken August 14, 2009), filed November 12, 2009 (Doc. 36-10)("Sisneros Depo."). Sisneros had a pair of shoes or sandals in one hand, and a pair of sunglasses in the other. See Sisneros Depo. at 43:6-20 (Doc. 36-10). See also Bloom Depo. at 47:19-49:14 (Doc. 40-4) and Espinosa Depo. at 74:12-75:7 (Doc. 40-2)(testifying that they did not see anything in Sisneros's hands). The Fishers testified, however, that all Mr. Fisher could tell was that Sisneros held a "shiny metal object." See Fisher Depo. at 14:23-15:19 (Doc. 36-3); Mia Fisher Depo. at 9:16-10:1 (Doc. 36-4).

At that point, Mr. Fisher exited his vehicle and asked his wife to call 911. Mia Fisher drove the car to the convenience-store parking lot and called 911 from her cellular telephone. See Fisher Depo. at 12:7-12 (Doc. 36-3); id. at 17:19-18:19 (Doc. 36-3); Mia Fisher Depo. at 4:19-5:19 (Doc. 36-4); Sanchez Depo. at 10:23-11:11 (Doc. 36-5); Espinosa Depo. at 34:6-7 (Doc. 36-8); id. at 62:13-63:15 (Doc. 36-8). Sanchez was sitting beside the Fishers' vehicle as it pulled up and Mr. Fisher exited. Mia Fisher told Sanchez that she was on her cellular telephone and had called the police. See Sanchez Depo. at 10:8-11:11 (Doc. 36-5). Later, Sanchez told Mr. Fisher that he had seen Sisneros and Trujillo arguing at the convenience store pay telephone, and that he had left

because he did not feel comfortable going inside the store.  See Mia Fisher Depo. at 14:5-23 (Doc. 36-4).[3]

It is at this point that the parties' stories drastically diverge.  Mr. Fisher testified that Sisneros then caught up with Trujillo, that Trujillo put his hands up in a defensive posture, that the two bumped chests, and that they appeared to be in a heated argument.  See Defendants' Memorandum Brief in Support of Their Motion for Summary Judgment ¶¶ 13-15, at 4, filed November 12, 2009 (Doc. 36)("Defendants' Brief"); Fisher Depo. at 16:1-19:15 (Doc. 36-3); Mia Fisher Depo. at 8:1-14 (Doc. 36-4).  Sisneros, on the other hand, insists that he never even reached Trujillo, and certainly did not bump chests with him.  See Response ¶ 13, at 4.  He further argues that Trujillo and Sisneros were never arguing or fighting.  See id.  Three witnesses -- Trujillo, the purported victim, Bloom, and Espinosa -- provide evidence of Sisneros's version of those facts.  See Bloom Depo. at 21:22-22:8, 42:3-48:22 (Doc. 40-4); Espinosa Depo. at 78:1-89:17 (Doc. 40-2); Trujillo Depo. at 18:1-24, 37:15-42:14 (Doc. 40-6).

According to a couple of the Defendants' witnesses, both Trujillo and Sisneros appeared drunk.  See Sanchez Depo. at 9:16-22 (Doc. 36-5); Bloom Depo. at 22:22-23:3 (Doc. 36-6).  Sisneros does not contest that it appeared to Bloom that Trujillo was drunk, see Response ¶ 15, at 4, but he contests that any of Mr. Fisher's witnesses ever saw him appear drunk.  Specifically, he again asserts that the person whom Sanchez saw outside the convenience store was not Sisneros, see id.[4]  Furthermore, there is testimony that, to at least one witness, Sisneros did not appear to be drunk

---

[3] Sisneros does not contest this fact, but again disputes that the persons whom Sanchez saw arguing outside the convenience store were Trujillo and himself.

[4] Sisneros's argument regarding Sanchez's testimony is that Sanchez likely saw two different men, not Sisneros and Trujillo, because Sanchez testified that the people he saw outside the convenience store appeared to be Anglo, while both Sisneros and Trujillo are Hispanic, and that

at that time.  See Bloom Depo. at 22:22-23:8 (Doc. 36-6)

      Mr. Fisher testified that, because he was concerned that the shiny object in Sisneros's hand was a weapon, he drew his gun and displayed his badge, announced that he was with the Sheriff's Department, and ordered both Trujillo and Sisneros to get on the ground.  See Report at 1-2; Fisher Depo. at 20:13-21:14 (Doc. 36-3); Mia Fisher Depo. at 7:16-25 (Doc. 36-4).  Sisneros disputes that Mr. Fisher initially announced himself as an officer, and presents evidence that Mr. Fisher forced -- rather than ordered -- Sisneros to the ground.  See Response ¶ 16, at 5; Bloom Depo. at 27:10-16 (Doc. 40-4); id. at 26:2-5, 30:2-31:11 (Doc. 40-4); Espinosa Depo. at 36:5-37:6, 77:1-21 (Doc. 40-2); Sisneros Depo. at 44:1-9 (Doc. 40-7)("I really can't remember what he said.  I just remember a gun in my face, and then he grabbed me and threw me to the floor.").  Mr. Fisher also insists that, once he discovered that the shiny item in Sisneros's hand was a pair of sunglasses, he re-holstered his weapon, and told Trujillo and Sisneros to calm down until the APD arrived.  See Report at 1-2; Fisher Depo. at 22:22-23:4 (Doc. 36-3).  Sisneros contests this fact as well.  See Response ¶ 1.

      The Defendants insist that Sisneros and Trujillo kept arguing for a time, and then Sisneros turned his aggression toward Mr. Fisher and began arguing with him.  See Report at 1-2; Fisher Depo. at 26:16-27:3 (Doc. 36-3).  The Defendants assert that, unlike Trujillo, who laid quietly on the ground, Sisneros began cursing at Mr. Fisher, telling him "Fuck you, unless you are going to charge me with something I don't have to listen to you," and "I don't have to listen to you; what are you going to charge me with?"  Report at 1-2; Fisher Depo. at 23:1-24:9, 27:4-25, 57:23-58:1 (Doc. 36-3), Mia Fisher Depo. at 10:14-17 (Doc. 36-4).  The Defendants further insist that Sisneros began to get up and eventually lunged at Mr. Fisher, and that it was not until Sisneros lunged at him that

Sanchez testified that the man who got arrested was the larger of the two men, while Sisneros, the arrestee, is smaller than Trujillo.  See Response ¶ 4, at 2-3.

Mr. Fisher physically restrained Sisneros.  See Report at 2; Fisher Depo. at 29:3-30:23 (Doc. 36-3).

Again, Sisneros's version of events is substantially different and is also supported by competent

evidence.  Sisneros contests that he and Trujillo were never arguing.  See Bloom Depo. at 21:22-

22:8, 42:3-18, 45:17-19, 48:7-22 (Doc. 40-4); Espinosa Depo. at 78:1-80:19, 86:10-89:17 (Doc. 40-

2); Trujillo Depo. at 18:1-24, 37:15-22, 41:9-42:14 (Doc. 40-6).  He asserts that Trujillo was not

quiet, but rather told Mr. Fisher that Mr. Fisher's actions were unnecessary.  See Trujillo Depo. at

34:6-24 (Doc. 40-6).  Sisneros also insists that he did not argue with Mr. Fisher nor use the word

"fuck" with him, and that he never tried to get up nor resist arrest.  Bloom Depo. at 28:8-10 (Doc.

40-4); Espinosa Depo. at 45:17-46:1, 83:1-7, 84:15-18 (Doc. 40-2); Sisneros Depo. at 46:10-16

(Doc. 40-7).  There is evidence that it was Mr. Fisher who repeatedly used foul language with

Trujillo and Sisneros, and even "rubbed [Sisneros's] face in the dirt [and] stuck . . . his fingers in

[Sisneros's] nostrils."  Trujillo Depo. at 24:13-21.  The parties also disagree about how long Mr.

Fisher had Sisneros on the ground before APD showed up to take over.  Mr. Fisher insists he

physically took Sisneros down just as Albuquerque Police Department ("APD") was showing up,

see Report at 2; Fisher Depo. at 31:8-32:13 (Doc. 36-3); Mia Fisher Depo. at 11:13-12:15 (Doc. 36-

4), whereas Sisneros contends that he was held on the ground for between five and twenty minutes

before APD arrived, see Sisneros Depo. at 49:11-15 (Doc. 40-7)(estimates 15-20 minutes); Trujillo

Depo. at 26:8-12 (Doc. 40-6)(estimates 5-10 minutes); Espinosa Depo. at 50:17-51:8 (Doc. 40-

2)(estimates 20 minutes or more).

    Eventually, the APD arrived to take control of the investigation.  APD Officer Kevin Kees

was one of those who arrived, and he contends that he observed Sisneros rolling around and refusing

to cooperate.  See Incident Report of Kevin P. Kees at 2 (dated June 17, 2006[sic]), filed November

12, 2009 (Doc. 36-11)("Kees Report"); Deposition of Kevin Kees at 7:23-8:5 (taken August 21,

2009), filed November 12, 2009 (Doc. 36-12).  On the other hand, Sisneros has evidence that his demeanor was subdued after he was detained, and that he did not struggle or say anything.  <u>See</u> Espinosa Depo. at 83:23-84:3 (Doc. 40-2).  <u>See also</u> Fisher Depo. at 32:16-33:3, 60:18-61:11 (Doc. 40-5)(commenting on, once restrained, he did not recall any further struggle from Sisneros); Mia Fisher Depo. at 12:21-20:1 (Doc. 40-8)(commenting on the lack of struggle after Sisneros was taken into custody).  Yet another dispute exists regarding who placed handcuffs on Sisneros and when.  Sisneros insists that it was Mr. Fisher, <u>see</u> Trujillo Depo. at 25:25-26:3 (Doc. 40-6); Sisneros Depo. at 48:2-7 (Doc. 40-7), and Mr. Fisher insists that it was an APD officer, <u>see</u> Fisher Depo. at 32:14-15 (Doc. 36-3); Mia Fisher Depo. at 12:23-13:4 (Doc. 36-4); Kees Depo. at 27:19-28:4 (Doc. 36-12)

The parties also disagree regarding when Mr. Fisher's participation of the arrest of Sisneros ended.  The Defendants insist that he stepped back and let APD take over as soon as they showed up, <u>see</u> Mia Fisher Depo. at 12:16-13:10 (Doc. 36-4), while Sisneros contends that Mr. Fisher stuck around and spoke in depth about what had occurred, <u>see</u> Trujillo Depo. at 33:6-16 (Doc. 40-6).  Kees conducted some investigation, however, and came to the conclusion that he should arrest Sisneros.  <u>See</u> Defendants' Brief ¶¶ 34-36, at 8; Sanchez Depo. at 11:20-12:8 (Doc. 36-5); Kees Depo. at 33:7-34:11 (Doc. 36-12).  The Defendants emphasize that Mr. Fisher did not make the decision to arrest Sisneros, and they argue that he did not arrest Sisneros.  <u>See</u> Defendants' Brief ¶¶ 35-37, at 8; Fisher Depo. at 36:1-7 (Doc. 36-3); Kees Depo. at 44:13-15 (Doc. 36-12).  Sisneros concedes that Mr. Fisher was not the arresting officer, but asserts that Mr. Fisher's conduct constituted a seizure in the constitutional sense, and was done without reasonable suspicion or probable cause.  <u>See</u> Response ¶ 36, at 8.

Kees then transported Sisneros to the Detention Center without incident, and Kees executed the Criminal Complaint charging Sisneros with Disorderly Conduct and Resisting, Obstructing, or

Refusing an Officer.  <u>See</u> Defendants' Brief ¶¶ 41-42, at 9; Response ¶¶ 41-42, at 9.  Mr. Fisher did

not formally bring the charges.  <u>See</u> Defendants' Brief ¶ 43, at 9; Response ¶ 43, at 9.  Eventually

the charges against Sisneros were dismissed.

## PROCEDURAL BACKGROUND

On February 20, 2009, Sisneros filed suit in the Second Judicial District Court for the County

of Bernalillo, New Mexico, bringing claims against Mr. Fisher and Bernalillo County for violations

of his civil rights under 42 U.S.C. § 1983, and for various common-law torts.  <u>See</u> Complaint for

Civil Rights Violations, Tort Claims and Damages at 1, filed March 5, 2009 (Doc. 1-2).  The

Defendants removed the case to federal court on March 5, 2009 because the federal-law claims that

Sisneros asserted gave the Court original jurisdiction pursuant to 28 U.S.C. §§ 1331.  <u>See</u> Notice of

Removal of Action by Defendant County of Bernalillo Pursuant to 28 U.S.C. Sections 1331, 1441,

1443, and 1446 ¶¶ 1-3, at 1, filed March 5, 2009 (Doc. 1).

The Defendants move the Court for summary judgment.  The Defendants filed a

Memorandum Brief in support of their motion.  <u>See</u> Defendants' Brief.  Sisneros filed his response

on November 30, 2009.  <u>See</u> Plaintiff's Response to Defendant's Motion for Summary Judgment,

filed November 30, 2009 (Doc. 40)("Response").  The Defendants filed their reply brief on

December 14, 2009.  <u>See</u> Defendants' Reply to Plaintiff's Response to Defendants' Motion for

Summary Judgment, filed December 14, 2009 (Doc. 45).

The Court held a hearing on December 31, 2009, wherein the parties primarily addressed the

issue of which facts are undisputed and whether the set of undisputed facts, free from

characterization and advocacy, established reasonable suspicion justifying Mr. Fisher's stop of

Sisneros and of Trujillo.  During the hearing, Ryan Villa, counsel for Sisneros, conceded that, if the

facts are as the Defendants' briefing describes them, there was clearly probable cause for an arrest.

See Transcript of Hearing at 19:22-20:5 (taken December 31, 2009)(Villa)("Tr.").[5]  On the other

hand, Deborah Wells, the Defendants' attorney, conceded that Mr. Fisher did not have probable

cause when he initiated the detention of Sisneros; rather, she argued that Mr. Fisher had only

reasonable suspicion.  See Tr. at 11:12-12:10 (Wells, Court).  Ms. Wells also conceded that the

rights at issue in this case are clearly established.  See Tr. at 8:4-15 (Court, Wells)("THE COURT:

. . .  We're not really dealing with any real disputed law; we're trying to just apply a fairly

established law to the facts of this case.  So it's probably going to hinge on that first prong [existence

of a violation].  Do you agree with that?  MS. WELLS: Right.  I do.").

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that

there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v.

Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e)

requires the non-moving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine

issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal

---

[5] The citations to the transcript of the hearing refer to the court reporter's original, unedited
version.  Any final transcript may have slightly different page and/or line numbers.

quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256(1986). See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'"). Nor can a party  "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and  Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at

250. A mere "scintilla" of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co.,

11 F.3d at 1539. Rather, there must be sufficient evidence on which the fact-finder could reasonably

find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting

Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice

Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable

. . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249 (internal citations omitted). Where a rational trier of fact, considering

the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the Court should keep in mind three

principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 249. Second, the Court must resolve all reasonable inferences and doubts in favor

of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Third, the Court cannot decide any

issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority." Harlow v. Fitzgerald, 457 U.S. at 807. Qualified immunity "protects federal and state

officials from liability for discretionary functions, and from 'the unwarranted demands customarily

imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. Civ.

-13-

08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Tenth Circuit has stated:

> When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden," [Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)] (internal quotation marks omitted), demonstrating, [(i)] that the defendant's actions violated a constitutional or statutory right and, [(ii)] that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct.  In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shoes would understand that what he or she did violated that right. If the plaintiff fails to satisfy either part of the two-part inquiry, we must grant the defendant qualified immunity.

Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  In Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson v. Callahan, the Supreme Court of the United States held that the court must decide whether there was a constitutional violation first, before it decides whether the law is clearly established.  See id. at 200-01.  Courts are no longer strictly required to analyze the issues in that order.  See Pearson v. Callahan, 129 S. Ct. at 818.

In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007).  "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the

-14-

facts must find support in the record[;] more specifically, as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (2009)(internal quotations and citations omitted). The blatant contradictions of the record must, however, be supported by more than other witnesses' testimony. See Rhoads v. Miller, No. 08-8093, 2009 WL 3646078, at **2-3 (10th Cir. Nov. 5, 2009)("Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury."). "The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely the province of the jury." Allen v. Wal-Mart Stores, Inc., 241 F.3d 1293, 1297 (10th Cir. 2001).

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Strepka v. Miller, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923). See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As the Supreme Court has observed, it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson v. Callahan, 129 S. Ct. at 819. Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

## LAW REGARDING FOURTH AMENDMENT SEIZURE

The Fourth Amendment protects a person's right to be secure against unreasonable search and seizure:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "[T]he rights of privacy and personal security protected by the Fourth Amendment 'are to be regarded as of the very essence of constitutional liberty; and . . . the guaranty

of them is as important and as imperative as . . . the guaranties of the other fundamental rights of the individual citizen.'" <u>Harris v. United States</u>, 331 U.S. 145, 150 (1947), <u>overruled in part by</u> <u>Chimel v. California</u>, 395 U.S. 752, 768 (1969) (quoting <u>Gouled v. United States</u>, 255 U.S. 298, 304 (1921)).[6]

The Supreme Court has found "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980).  Where the individual could not or would not want to leave, however, even absent police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991).

Since <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court of the United States has recognized that there are two seizures.  <u>See</u> <u>United States v. Maddox</u>, 388 F.3d 1356, 1361  (10th Cir. 2004)("Prior to <u>Terry v. Ohio</u>, . . . Fourth Amendment seizures of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause.")(citing <u>Dunaway v. New York</u>, 442 U.S. 200, 208 (1979)).  In <u>Terry v. Ohio</u>, the Supreme Court "approach[ed] the issues . . . mindful of the limitations of the judicial function in controlling the myriad daily situations in which policemen and citizens confront each other on the street."  <u>Terry v. Ohio</u>, 392 U.S. at 12.  Now,

---

[6] The protections of the Fourth Amendment are incorporated into the Fourteenth Amendment, and therefore restrict the conduct of state actors just as they do to federal actors.  <u>See</u> <u>California v. Minjares</u>, 443 U.S. 916, 921 (1979)("In <u>Wolf v. Colorado</u>, 338 U.S. 25 . . . (1949), the Court held that the Fourth Amendment was applicable to the States by incorporation through the Fourteenth Amendment.  This was, and remains, a thoroughly defensible proposition."); <u>United States v. Rodriguez-Rodriguez</u>, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").

while the law still requires that a police officer have probable cause to affect a formal arrest of an individual, certain seizures -- generally short-term seizures wherein the citizen's rights are not significantly affected -- can be made based on reasonable suspicion alone.  See, e.g., Terry v. Ohio, 392 U.S. at 30-31; United States v. Maddox, 388 F.3d 1356, 1362 (10th Cir. 2004).

      **1.**     **The Terry Stop.**

The concept of police seizures based on less than probable cause began with Terry v. Ohio. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Id. at 9 (quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891)).  Nevertheless, the Constitution does not forbid all searches and seizures, but only unreasonable ones.  See Terry v. Ohio, 392 U.S. at 9 (citing Elkins v. United States, 364 U.S. 206, 222 (1960)).  In Terry v. Ohio, the Supreme Court upheld a "stop-and-frisk" under a newly articulated rule: if an officer has reasonable and articulable suspicion that a person might be involved in criminal activity, the officer may briefly stop that person for the purpose of confirming or dispelling that suspicion.  See Terry v. Ohio, 392 U.S. at 21-22, 30; United States v. Maddox, 388 F.3d at 1361.  Similarly, if the officer has reasonable and articulable suspicion to believe that the suspect might be armed and dangerous, the officer can execute a protective frisk of the suspect's outer clothing.  See Terry v. Ohio, 392 U.S. at 27, 30; United States v. Maddox, 388 F.3d at 1361.

      **2.**     **The Reasonable-Suspicion Standard.**

Regardless whether the seizure is a stop or an arrest, the officer needs some amount of "cause," i.e., the quantity and quality of facts hinting at criminality, to execute it.  The quantum of cause that an officer needs to justify a stop is less than that needed to justify an arrest.  See United

States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009)("[T]he level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause.")(quoting United States v. Lopez, 518 F.3d 790, 799 (10th Cir.2008)). To lawfully execute an arrest, an officer needs probable cause, which the Tenth Circuit defines as knowledge of "facts and circumstances[, learned] through reasonably trustworthy information[,] that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir.1996)). To execute a lawful stop, on the other hand, the officer needs only reasonable suspicion. See Terry v. Ohio, 392 U.S. at 30-31; United States v. Maddox, 388 F.3d at 1362.

Reasonable suspicion is described as a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. White, 584 F.3d 935, 949 (10th Cir. 2009). This standard does not mean that the officer must rule out all possible innocent conduct, see United States v. Arvizu, 534 U.S. 266, 277 (2002), but "[i]nchoate suspicions and unparticularized hunches are not sufficient," United States v. DeJear, 552 F.3d at 1200. In determining whether reasonable suspicion existed, the court must look objectively at the totality of the circumstances of which the officer was aware. See United States v. Arvizu, 534 U.S. at 273; United States v. Ceballos, No. 09-2021, 2009 WL 4642368, at *2 (10th Cir. Dec. 9, 2009)(holding that, notwithstanding the officer's testimony that he had no suspicion of criminality, the officer was aware of facts that would give rise to reasonable suspicion in the mind of a reasonable officer).

### 3. The Scope of an Officers' Conduct During a Detention Determines Whether There Is a Stop or an Arrest.

If a police officer, otherwise executing a Terry-like "stop," exceeds the permissible scope

of such a stop, that stop is transformed into an arrest.  For example, in United States v. Place, 462

U.S. 696 (1983), the Supreme Court addressed whether a ninety-minute seizure of a person's

luggage -- initially permissible based on reasonable suspicion -- bloomed into a full seizure

requiring probable cause based on the extended duration of the police custody.[7]  The Supreme Court

held that such action was a seizure, and that, because the police had only reasonable suspicion -- not

probable cause -- to justify it, the seizure was unlawful.  See 462 U.S. 696, 710.

The Supreme Court affirmed the United States Court of Appeals for the Second Circuit's

decision to suppress the evidence, reasoning:

> In the ordinary case, the Court has viewed a seizure of personal property as *per se*
> unreasonable within the meaning of the Fourth Amendment unless it is accomplished
> pursuant to a judicial warrant issued upon probable cause and particularly describing
> the items to be seized.
>
> * * * *
>
> The exception to the probable-cause requirement for limited seizures of the person
> recognized in Terry and its progeny rests on a balancing of the competing interests
> to determine the reasonableness of the type of seizure involved within the meaning
> of the Fourth Amendment's general proscription against unreasonable searches and
> seizures.  We must balance the nature and quality of the intrusion on the individual's
> Fourth Amendment interests against the importance of the governmental interests
> alleged to justify the intrusion.  When the nature and extent of the detention are
> minimally intrusive of the individual's Fourth Amendment interests, the opposing
> law enforcement interests can support a seizure based on less than probable cause.

462 U.S. at 701-03.  Of course, a general interest in law enforcement is insufficient to justify

infringing on a person's Fourth Amendment rights without probable cause.  See United States v.

---

[7] United States v. Place dealt with the permissible scope of a reasonable-suspicion detention
of a person's property rather than of the person himself.  See id. at 709.  The Supreme Court,
however, did not find that distinction meaningful: "[W]hen the police seize luggage from the
suspect's custody, we think the limitations applicable to investigative detentions of the person
should define the permissible scope of an investigative detention of the person's luggage on less
than probable cause."  Id. at 708-09.

Place, 462 U.S. at 703-04.  To hold otherwise would render the probable-cause requirement superfluous, because the Fourth Amendment is almost always violated in the context of overzealous law enforcement in the "often competitive enterprise of ferreting out crime."  Johnson v. United States, 333 U.S. 10, 14 (1948).

Thus, under the facts of United States v. Place, somewhere between zero and ninety minutes, the detention crossed the line from "stop" to "arrest."  The Supreme Court was careful to specify, however, that it is the totality of circumstances, not strictly duration, that makes an arrest.  See United States v. Sharpe, 470 U.S. 675, 686 (1985) ("We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct.  Nevertheless, we question the wisdom of a rigid time limitation.  Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.") (quoting United States v. Place, 462 U.S. at 709).

The Tenth Circuit has expressly agreed that a police/citizen encounter that goes beyond the limits of a Terry stop is an arrest which must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  Id.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  Id. (quoting Florida v. Royer, 460 U.S. 491 (1983)).

-21-

**4.**      <u>Use of Guns or Handcuffs Usually, but not Always, Turns a Stop into an Arrest</u>.

The Court has before engaged in the determination when a detention becomes an arrest.  In <u>United States v. Perea</u>, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>United States v. Burciaga-Burciaga</u>, 147 Fed. Appx. 725, 731 (10th Cir. 2005), the Court had to determine whether the police actors transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  <u>See United States v. Perea</u>, 374 F. Supp. 2d at 976.  In that case, officers stopped a vehicle fitting the description of the one used in a drug transaction.  <u>See id.</u> at 975.  The vehicle's windows, however, were tinted and the officers did not know who or how many people were inside.  Furthermore, the officers believed that the driver was wanted in connection with a murder investigation, as well as being involved in the narcotics transaction.  <u>See id.</u> at 975-76.  The Court found that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  <u>See id.</u> at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a <u>Terry</u> stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  <u>See United States v. Gama-Bastidas</u>, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'")(quoting <u>United States v. Perdue</u>, 8 F.3d at 1462-63).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" <u>United States v. Perea</u>, 374 F. Supp. 2d at 974 (quoting <u>United States v. Perdue</u>, 8 F.3d at 1462).  <u>See also</u> <u>United States v. Merkley</u>, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d 1064; United States v. Miller, 874 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents."). United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person that they were detaining was the suspect that they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous. See United States v. Perea, 374 F. Supp. 2d at 976.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit placed upon the government the "burden of demonstrating that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Id. at 1052. While the Tenth Circuit recognized that there is no bright-line rule to guide whether the scope of police conduct stayed within the bounds of an investigative stop, see id. at 1052, it held that "the use of force such as handcuffs and firearms is a far greater level of intrusion [than the ordinary investigative stop], and requires the government to demonstrate that 'the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate," id. After reviewing the relevant law, the Tenth Circuit held:

[There was no evidence or testimony from the police that they had reason to believe

these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the <u>Terry</u> stop. In the absence of such evidence, the naked fact that drugs are suspected will not support a *per se* justification for use of guns or handcuffs in a <u>Terry</u> stop.

28 F.3d at 1052-53. The Tenth Circuit therefore held that the detention was an arrest, rather than an investigative detention, and, because the government made no argument that the officers had probable cause, it held that the arrest was unlawful. <u>See</u> <u>id.</u> at 1053. Thus, it appears that, in the Tenth Circuit, there must be something more than the fact that the underlying crime was violent to justify officers' use of handcuffs and/or handguns during an investigative detention. Without such additional justification, the guns and handcuffs transform that investigative detention into an arrest.

## LAW REGARDING EXCESSIVE USE OF FORCE

Courts analyze Fourth-Amendment excessive force claims "under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries." <u>Cordova v. Aragon</u>, 569 F.3d 1183, 1188 (10th Cir. 2009). <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

<u>Weigel v. Broad</u>, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(internal quotation marks and citations omitted). Additionally, a court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . That perspective includes an examination of the information possessed by the [officers]." <u>Id.</u> at

1152 (citations and internal quotation marks omitted).  See Wilder v. Turner, 490 F.3d 810, 814 (10th Cir. 2007)("[P]robable cause for a warrantless arrest is determined in terms of the circumstances confronting the arresting officer at the time of the seizure.")(quoting Summers v. Utah, 927 F.2d 1165, 1166 (10th Cir. 1991)).

> ### 1.   **The Actual-Injury Requirement.**

There might appear to be some tension within the Tenth Circuit case law whether physical injury is an element of an excessive-use-of-force claim.  The Tenth Circuit has stated that there is no physical-injury element, yet, in handcuffing cases, the Tenth Circuit has required something more than redness or soreness to establish the actual-injury element of an excessive-use-of-force claim. The Court concludes that, in the Tenth Circuit, temporary redness or soreness is, as a matter of law, a de minimis injury for the purpose of an excessive-use-of-force claim.  The cases make clear that "actual injury," not "physical injury," is required to sustain a claim of excessive use of force.  E.g., Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)("[T]o recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some underlined actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional.")(quoting Cortez v. McCauley, 478 F.3d 1108, 1129 n.25 (10th Cir. 2007)(en banc)(emphasis added).  As the Tenth Circuit explained in Vondrak v. City of Las Cruces: "We have consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims. . . .  Nevertheless, when an excessive force claim relies upon unduly tight handcuffing, we have held that the plaintiff must show 'some actual injury.'"  Vondrak v. City of Las Cruces, 535 F.3d at 1208 (citing Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001))(internal citations omitted, emphasis added).  In Cortez v. McCauley, the Tenth Circuit explained in more depth:

> In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some <u>actual</u> injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight.  Although Rick Cortez complained to the officer that the handcuffs were too tight, the summary judgment record presents too little evidence of any actual injury.  We believe that a claim of excessive force requires some <u>actual injury that is not de minimis, be it physical or emotional.  The only evidence in the record is his affidavit that the handcuffs left red marks that were visible for days afterward.</u>  This is insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified.

<u>Cortez v. McCauley</u>, 478 F.3d at 1129 (internal citations omitted, emphasis added).  Thus, in <u>Cortez v. McCauley</u>, the Tenth Circuit rejected Mr. Cortez' excessive-use-of-force claim, not because he lacked physical injury, but because his injury -- in his case, a physical injury -- was de minimis.  <u>See id.</u> at 1129-30.  The implication is that, had Mr. Cortez alleged some emotional injury, or some additional physical injury such as a dislocated shoulder or sprained wrist, his injuries would have risen to a non-de minimis level and become the "actual injury" that an excessive-use-of-force claim requires.  <u>See, e.g., Vondrak v. City of Las Cruces</u>, 535 F.3d at 1209 (finding genuine issue of fact existed as to whether plaintiff suffered "actual injury" when, in addition to unduly tight handcuffing, plaintiff provided evidence that he might have permanent nerve damage in his wrists).

The quintessential example is <u>Holland ex rel. Overdorff v. Harrington</u>, in which a Sheriff deployed the SWAT team to execute an arrest warrant at a home in which the officers knew that other persons, including children, would be present.  <u>See Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d at 1192.  The Tenth Circuit had to answer the question whether the officers' action of detaining the plaintiffs "at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes, and ultimately gathering all of them in the livingroom of the residence" was an excessive use of force under the Fourth Amendment.  268 F.3d at 1192.  Ultimately, the Tenth Circuit found that it was an excessive use of force, notwithstanding the lack of any alleged physical

injuries:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. These are the very ingredients relevant to an excessive force inquiry. Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use. Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

Id. at 1192-93 (internal citations and quotation marks omitted). The Tenth Circuit, however, did not stop there. In response to an argument that the plaintiff's claim must fail for want of evidence of physical injury, the Tenth Circuit stated:

> Physical injury may be the most obvious injury that flows from the use of excessive force. Yet the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests -- a person's "sense of security" and individual dignity. No physical injury was pleaded in Baker or McDonald. Nor was physical injury alleged in Bivens v. Six Unknown Named Agents, 403 U.S. 388 . . . (1971), which held that officers may be held liable in damages for violating persons' Fourth Amendment rights, including the use of unreasonable force.

268 F.3d at 1195. It thus appears that the Tenth Circuit does not require evidence of physical injury to satisfy the "actual injury" element of an excessive-use-of-force claim. Neither Vondrak v. City of Las Cruces nor Cortez v. McCauley repudiate that rule. See Fisher v. City of Law Cruces, 584 F.3d at 897 (stating that Cortez v. McCauley "acknowledged -- and did not overrule -- our prior conclusion that in excessive force cases 'proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element.'"). The holdings in those cases apparently demonstrate only that the Tenth Circuit has decided that the injuries alleged in those cases -- redness and pain caused by unduly tight handcuffing -- is, as a matter of law, a de minimis injury.

In some instances, emotional trauma in addition to the soreness in the plaintiff's wrists is still insufficient.  In one unpublished opinion, the Tenth Circuit has held that officers committed no constitutional violation when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction-of-justice statute.  See Silvan W. v. Briggs, 309 Fed. Appx. 216, 224 (10th Cir. 2009).  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See id.  In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

> While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed. Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing. . . .  Similarly, there is no evidence that Cory suffered any injury from being denied liquids. . . .  Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity -- even if it may later seem unnecessary in the peace of a judge's chambers -- rises to the level of a constitutional violation.

Id. at 224-25 (citations and internal quotation marks omitted).

## 2.      Overlapping Excessive-Force and Unlawful-Arrest Claims.

The Tenth Circuit has also explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in

proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Id. at 1126.  Thus, the Court must engage in a two-part inquiry when addressing combined excessive-use-of-force and unlawful-arrest claims.  First, was there an unlawful arrest?  Second, if there was an unlawful arrest, was the amount of force used greater than what would have been necessary to affect a lawful arrest?  If the amount of force used would have been reasonable to affect an arrest if an arrest had been justified, the damages for excessive force are subsumed within the damages for unlawful arrest.  It is only when the force was excessive as compared to the execution of a lawful arrest that a plaintiff can recover on both claims.  See id. at 1126.

### LAW REGARDING THE NEW MEXICO TORT CLAIMS ACT

The New Mexico Tort Claims Act ("NMTCA") was enacted in recognition of "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  NMSA 1978, § 41-4-2(A).  The New Mexico Legislature also recognized "that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done."  NMSA 1978 § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."  NMSA 1978 § 41-4-2(A).  The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty." NMSA 1978 § 41-4-2(C).

The NMTCA is the "exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act . . . ." NMSA 1978, § 41-4-17(A). A governmental entity of New Mexico may not be sued unless the plaintiff's cause of action fits within one of the exceptions granted to governmental entities and public employees in the NMTCA. See Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985), rev'd on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986). "Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act." Begay v. State, 104 N.M. at 487, 723 P.2d 256 (internal quotation marks omitted). Thus, if the court cannot find a specific waiver in the NMTCA, the court must dismiss the plaintiff's complaint. See Begay v. State, 104 N.M. at 487, 723 P.2d 256

A plaintiff may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity. "In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits for damages to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act." Barreras v. N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App. 2002). See Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1997)(noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution unless immunity is waived under the NMTCA); Rubio v. Carlsbad Mun. Sch. Dist., 106 N.M. 446,449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board.); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suits for

-30-

damages under Article II, § 11 of the New Mexico Constitution).  Those waivers are, however, relatively broad:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 [granting immunity from liability for torts committed within the scope of duty] does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from <u>assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico</u> when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12 (1976)(emphasis added).  Thus, an officer can be held liable for most intentional torts committed while in the course and scope of the officer's duties.

## <u>ANALYSIS</u>

As the recitation of facts indicates, the summary-judgment record is riddled with disputed facts, with evidentiary support on either side, all of which must be taken in favor of the non-moving party, Sisneros.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. at 378-80; <u>Hunt v. Cromartie</u>, 526 U.S. at 550-55; <u>Hertz v. Luzenac Group</u>, 576 F.3d 1103, 1108 (10th Cir. 2009)("An issue of material fact is genuine if the nonmovant presents facts that would allow a reasonable jury to find in favor of the nonmovant.").  The core inquiry, then, is whether the disputed facts are material.  The Court concludes that they are.

## I.     QUALIFIED IMMUNITY DOES NOT PROTECT MR. FISHER FROM Sisneros's SECTION 1983 CLAIMS.

The only issue that the Defendants raise with respect to the Section 1983 claims against Mr. Fisher is that qualified immunity protects Mr. Fisher.  <u>See</u> Defendants' Brief at 13-19.  Sisneros disagrees and asserts that he has established -- with respect to both his false-arrest and excessive-use-of-force claims -- a violation of a clearly established right.  <u>See</u> Response at 10-22.  The Court agrees with Sisneros on this point and will deny the Defendants' motion for summary judgment on

Sisneros's Section 1983 claims.

### A.   GENUINE FACTUAL ISSUES EXIST WHETHER REASONABLE SUSPICION TO STOP SISNEROS EXISTED.

The first hurdle that Sisneros must clear to defeat the Defendants' assertion of qualified immunity is to establish the existence of a violation of his constitutional or statutory rights.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327 ("When a defendant asserts qualified immunity as summary judgment, the responsibility shifts to the plaintiff to meet a 'heavy two-part burden,' demonstrating, first, that the defendant's actions violated a constitutional or statutory right.")(internal citations omitted).  Sisneros's first asserted violation is an unlawful arrest in violation of the Fourth and Fourteenth Amendments to the Constitution.  In response to this allegation, the Defendants argue that it "is undisputed that . . . Fisher did not handcuff, arrest, charge, transport, or file charges against Plaintiff," and that therefore "there is no viable cause of action against . . . Fisher for 'wrongful arrest.'"  Defendants' Brief at 16.  They then argue that it is improper to consider Sisneros's version of events when ruling on this motion, because the existence of reasonable suspicion or probable cause must be made solely from the viewpoint of the officer at the time of the events underlying Sisneros's claims, and the undisputed facts, viewed from the eyes of Mr. Fisher, give rise to probable cause.  See Defendants' Brief at 17 (citing Kee v. Ahlm, 219 Fed. Appx. 727, 732 (10th Cir. 2007)).  Sisneros responds with three theories of unlawful arrest: (i) Mr. Fisher's initial seizure of Sisneros was without reasonable suspicion or probable cause to believe Sisneros was committing a crime; (ii) if Mr. Fisher reasonably, though mistakenly, believed that Sisneros was armed and threatening Trujillo, Mr. Fisher's continued detention of Sisneros once he learned that Sisneros carried only shoes and sunglasses was an unlawful seizure; and (iii) Mr. Fisher's misrepresentations to Kees that resulted in Kees placing Sisneros under arrest constituted

an unlawful seizure by Mr. Fisher.  See Response at 14.

As an initial matter, the Court rejects the Defendants' first argument that the fact that Mr. Fisher did not "handcuff, arrest, charge, transport, or file charges against Plaintiff" means that "there is no viable cause of action against defendant Fisher for 'wrongful arrest.'" Defendants' Brief at 16. This argument appears to confuse the formal-arrest procedure with the Fourth Amendment's concept of an arrest, which has been described as a "seizure[] characterized by highly intrusive or lengthy detention and which require[s] probable cause to believe that the arrestee has committed or is committing a crime." United States v. Seslar, 996 F.2d 1058, 1060 (10th Cir. 1993).  Thus, that Mr. Fisher did not "handcuff" -- a fact that is, itself, disputed -- "charge, transport, or file charges against" Sisneros does not dictate whether Mr. Fisher "arrested" him for the purpose of Sisneros's Section 1983 claim.

The Court is now saddled with the duty of reconstructing this story from Mr. Fisher's perspective, see Kee v. Ahlm, 219 Fed. Appx. at 732, while finding disputed facts and all reasonable inferences in favor of Sisneros.  In doing so, the Court finds that a reasonable jury might find that Mr. Fisher was aware, or should have been aware, of the following facts, if it were to receive the same evidence now before the Court:

> At about 8:15 p.m. on June 17, 2007, Mr. Fisher was in the car driving home from a Fathers' Day dinner with his family.  His wife, Mia, was in the passenger seat and his two children were in the back seat.  As he approached the intersection of Juan Tabo and Horseshoe Trail, he saw a Hispanic man in a black shirt and jeans -- Trujillo -- walking north on the west side of Juan Tabo.  Mr. Fisher then saw another Hispanic man -- Sisneros -- jogging toward Trujillo, holding a pair of shoes in one hand and a small, shiny object in the other.  As Sisneros crossed Juan Tabo and continued toward Trujillo, he called out, in a communicative tone, that Trujillo should stop to allow Sisneros to catch up.  Mr. Fisher then saw Trujillo stop and turn, watching, unconcerned, as Sisneros approached.

On the other hand, were the same reasonable jury to credit the testimony and evidence of Mr. Fisher,

-33-

it might find that Mr. Fisher observed the following:

> At about 8:15 p.m. on June 17, 2007, Mr. Fisher was in the car heading home from a Fathers' Day dinner with his family. He was in the passenger seat, his wife, Mia, was driving, and his two children were in the back seat. As he approached the intersection of Juan Tabo and Horseshoe Trail, he saw a man in a black shirt and jeans -- Trujillo -- walking north on the west side of Juan Tabo. Mr. Fisher then saw a second man -- Sisneros -- charging toward Trujillo, holding a shiny object in a menacing fashion. Sisneros yelled threateningly at Trujillo as he approached. Trujillo then turned, appearing startled or concerned, and raised his hands in a defensive posture as Sisneros drew near. When Sisneros reached Trujillo, the two engaged in a heated argument that involved Sisneros and Trujillo yelling, shoving, and bumping chests.

As Mr. Villa conceded during the hearing on this motion, if the facts are as the Defendants' briefing describes them, there was clearly probable cause for an arrest. See Tr. at 19:22-20:5 (Villa)("I mean, if they believe defendant Fisher, we lose."); id. at 26:15-27:20 (Villa). The question, however, is whether the first scenario -- Sisneros's version of events -- gives rise to reasonable suspicion or probable cause. The Court concludes that it does not.[8] The key aspects that create reasonable suspicion in Mr. Fisher's characterization of events -- the threatening yell, the aggressive body language, Trujillo's concerned/defensive posture, the heated argument, and the physical contact between Trujillo and Sisneros -- are all controverted by Sisneros's evidence. Thus, if a fact-finder were to credit Sisneros's evidence over the Defendants', all that would remain is a man jogging across a street toward another person, with whom he is trying to communicate, while carrying some sandals and something small and shiny. The cadence of Sisneros's stride, the tone of his shout, and the expression on his face -- all facts in dispute -- could make this scene appear to be a brewing fight or, on the other hand, appear to be a friend trying to catch up to another friend

---

[8] The Court focuses its analysis on the issue of reasonable suspicion because Ms. Wells conceded that Mr. Fisher did not have probable cause when he initiated the detention of Sisneros and Trujillo. See Tr. at 11:12-12:10 (Wells, Court).

to convey some news.  That Sisneros was barefoot and carrying his shoes in one hand gives the

Court additional reason to question how threatening Sisneros could have appeared.  In short, if the

facts were as Sisneros's witnesses testify, granting Sisneros the benefit of all reasonable inferences,

no reasonable officer would have believed that they had reasonable suspicion and/or probable cause

to detain Sisneros.

The Court realizes that showing reasonable suspicion is a low burden that is generally easy

for an officer to meet.  See United States v. DeJear, 552 F.3d at 1200 ("[T]he level of suspicion

required for reasonable suspicion is 'considerably less' than proof by a preponderance of the

evidence or that required for probable cause.")(quoting United States v. Lopez, 518 F.3d 790, 799

(10th Cir.2008)).  One of the most recent Tenth Circuit cases on reasonable suspicion, United States

v. Ceballos, provides an example.  In United States v. Ceballos, the police officer observed a young

girl walking down the street at night.  See 2009 WL 4642368, at *1.  A truck pulled up along the

girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl

continued on her walk.  See id.  Rather than leave, however, the truck drove ahead and parked with

its lights off at a dark spot on the road by which the girl would have to walk.  See id.  The officer

spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only

if she needed a ride; she had refused.  See id.  Not investigating any particular crime or suspected-

crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up

behind the truck.  Id.  Upon talking to Ceballos, the officer discovered that Ceballos' breath smelled

of alcohol, he did not have a drivers license, and he had a gun and other items in his vehicle.  See

id., at *1-2.

Ceballos sought to suppress all evidence found in his vehicle because his entire encounter

with the officer was a stop executed without reasonable suspicion, in violation of the Fourth

Amendment.  See id., at *2.  The district court found that the circumstances were insufficient to give rise to a reasonable suspicion that the driver, Ceballos, was engaged in or about to engage in any criminal conduct, and that the officer's testimony demonstrated that he did not suspect Ceballos of any particular crime.  See id.  The district court therefore suppressed the evidence.  See id.  The Tenth Circuit disagreed, finding that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed, and that "Gallegos's subjective characterization of his actions is irrelevant."  Id.

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.

> * * * *

> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

Id., at **2-3.

This case is unlike United States v. Ceballos, however, in a number of ways.  Most importantly, this is a motion for summary judgment in a civil-rights case wherein the Court is determining whether material factual disputes exist, rather than a motion to suppress evidence in a criminal case wherein the Court would act as fact-finder for the purpose of determining whether

certain evidence is admissible. See Fed. R. Evid. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . ."). Competent opposing evidence controverts almost all of Mr. Fisher's factual allegations that might give rise to reasonable suspicion. If the facts are as Sisneros asserts, this case is not one in which Mr. Fisher "reasonably but mistakenly conclude[d] that probable cause [or reasonable suspicion] [was] present," Defendants' Brief at 16-17; Anderson v. Creighton, 483 U.S. at 641; Reply at 9 (citing Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)); rather, if the facts are as Sisneros's alleges, this case is one in which an overzealous law enforcer saw suspicious activity where none existed. See, e.g., Poolaw v. Marcantel, 565 F.3d 721, 736-37 (10th Cir. 2009)(holding that the facts that "(1) Chara told her mother she was anxious about having a gun in her car, (2) Chara was [the primary homicide-suspect]'s sister-in-law, and (3) the . . . homicide weapon had not been found" did not establish reasonable suspicion to believe the homicide weapon was in Chara's vehicle); Cortez v. McCauley, 478 F.3d at 1123 (holding that allegations of two-year-old girl that suspect had sexually abused her did not provide officers reasonable suspicion to detain suspect's wife). The Court is hesitant to hold that a police officer may, as a matter of law, tackle and restrain an individual for jogging across the street and trying to get his friend's attention, because the officer unreasonably perceived the scene as one in which violence might occur. Genuine and material issues therefore exist regarding the factual basis of Mr. Fisher's purported reasonable suspicion.

The other half of an unlawful arrest, of course, is a seizure. A person is seized in the constitutional sense if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. at 554. Crediting Sisneros's evidence and viewing it in the light most favorable to him, Fisher ordered Sisneros and Trujillo, at gunpoint, to stop in their tracks, then physically forced Sisneros to the

ground.  Such conduct by a police officer constitutes a seizure.  See Bradford v. Wiggins, 516 F.3d 1189, 1196 (10th Cir. 2008)("A Fourth Amendment seizure occurs when a police officer restrains the liberty of an individual through physical force or show of authority.")(emphasis added); Reeves v. Churchich, 484 F.3d 1244, 1251 (10th Cir. 2007)("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.")(quoting Terry v. Ohio, 392 U.S. at 19 n.16).  Given the lack of aggravating circumstances -- at least when viewing the facts as Sisneros's evidence portrays them -- the seizure was a full-blown arrest, based on Mr. Fisher's use of his handgun and other physical force.  See United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'"); United States v. Perea, 374 F. Supp. 2d at 974("[I]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause.").  Sisneros has therefore -- for the purpose of this summary judgment motion -- established that Mr. Fisher violated his Fourth and Fourteenth Amendment rights.

**B.    SISNEROS FAILED TO PROVIDE EVIDENCE THAT HE SUFFERED AN ACTUAL INJURY, THUS QUALIFIED IMMUNITY PROTECTS MR. FISHER FROM SISNEROS'S EXCESSIVE-USE-OF-FORCE CLAIM.**

Sisneros has also shown a genuine issue of fact whether Mr. Fisher used excessive force in affecting an arrest of Sisneros.  The Defendants argue that police officers are entitled to use some amount of force when arresting an individual, and that the amount of force used by Mr. Fisher was reasonable under the circumstances, as viewed from Mr. Fisher's perspective.  See Defendants' Brief at 14-15 (citing Cortez v. McCauley, 487 F.3d at 1128-30).  They also argue that Sisneros has no cognizable, non-de minimis injury and therefore cannot sustain an excessive-use-of-force claim.

See id. (citing Cortez v. McCauley, 487 F.3d at 1129).  Finally, the Defendants assert that Mr. Fisher's decision to draw his weapon and point it at Sisneros was consistent with law enforcement training, that Mr. Fisher did not strike Sisneros, and that Sisneros was not physically injured in the encounter.  See Defendants' Brief at 15-16.

Sisneros concedes that an officer is permitted to use a certain amount of force when executing a Terry stop, but that the amount of force used was excessive under the circumstances, assuming the facts are as Sisneros's evidence portrays them.  See Response at 12-14.  Sisneros characterizes his evidence as showing that "Fisher ran up to [Sisneros], physically took him to the ground while pointing his gun at [Sisneros's] face, placed his knee on [Sisneros's] neck, handcuffed [Sisneros], and held him for a period of 10 to 20 minutes." Response at 12-13.  He essentially argues that, viewing the evidence in this light, a reasonable jury could find that Mr. Fisher's use of force was excessI've.  See id. at 13-14.  The Court agrees.

Once again, the Court must attempt to view the scene through the eyes of Mr. Fisher, while crediting Sisneros's evidence and giving him the benefit of inferences that a reasonable jury might draw.  In doing so, we agree with Sisneros's characterization -- that Mr. Fisher might have run up to Sisneros, taken him to the ground at gunpoint, placed his knee on Sisneros's neck, handcuffed him, and held him on the ground for up to twenty minutes.  If the Court likewise credits Sisneros's evidence that he was jogging, that he was shouting in a conversational tone, that he was carrying his sunglasses and sandals, and that Trujillo did not appear concerned at Sisneros's approach, the Court finds that no reasonable officer would have found that the amount of force used was reasonable.  See Graham v. Connor, 490 U.S. at 395 ("Today we . . . hold that all claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its

-39-

"reasonableness" standard."); Cordova v. Aragon, 569 F.3d at 1188 ("A Fourth Amendment claim of excessive force is analyzed under the "objective reasonableness" standard that governs other Fourth Amendment inquiries."). And, although the reasonableness analysis is to be made in light of the totality of circumstances of which the officer was aware, see Weigel v. Broad, 544 F.3d at 1151-52, no circumstance vitiates the wrongfulness of Mr. Fisher's alleged actions. There was no alleged crime that justified Mr. Fisher's conduct, Sisneros was not a threat to Mr. Fisher's or Trujillo's immediate safety, and Sisneros did not significantly resist Mr. Fisher's attempt to detain him. See id. (listing the factors a court should analyze in determining whether force was excessive).[9] This case is unlike Cortez v. McCauley, where the Tenth Circuit granted qualified immunity to an officer who handcuffed an individual -- allegedly too tightly -- and placed him in a squad car when that individual was accused of committing a violent felony. See Cortez v. McCauley, 478 F.3d at 1128. Fisher had no basis to believe that Sisneros was wanted for anything, much less for a crime of violence, which might justify substantial physical restraint for Mr. Fisher's own safety.

Perhaps prepared for the Court to find that, under the circumstances, Mr. Fisher used more force than would have been necessary to affect a lawful arrest, the Defendants quote a passage from Sturdivan v. Murr, 511 F.3d 1255 (10th Cir. 2008): "Indeed, even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back[,] the officer would be justified in using more force than in fact was needed." Defendants' Brief at 15 (citing Sturdivan v. Murr, 511 F.3d

---

[9] Sisneros's excessive-use-of-force claim may coexist with his false-arrest claim because, viewing the evidence in the light most favorable to Sisneros, even if Mr. Fisher had cause to seize Sisneros, a reasonable jury could conclude that Mr. Fisher used excessive force to effectuate that seizure. See Cortez v. McCauley, 478 F.3d at 1127 (holding that, relative to the threat that she posed, "physically separat[ing] Tina Cortez from her telephone; [taking] her by the arm; . . . escort[ing] her from her home; [taking] the keys to her home and lock[ing] the door, and . . . plac[ing] her in the locked back seat of a patrol car" was excessive force, as well as an unlawful seizure under the Fourth Amendment).

at 1260)(alterations omitted).  The Court, however, finds that, if Sisneros's version of events is believed, it would not have been reasonable for Mr. Fisher to believe it was necessary to pull his sidearm, point it at Sisneros, force Sisneros to the ground, and handcuff him.  A reasonable fact-finder might determine that version of events is what happened.  Under that view of the evidence presented, the Court finds that no reasonable officer would have believed that the amount of force used was appropriate.

Finally, the Defendants assert that Sisneros cannot establish a violation because he has suffered no cognizable injury.  See Defendants' Brief at 14-15; Reply at 7.  Sisneros admits that he suffered no substantial physical injury, see Response ¶ 52, at 10; Tr. at 37:6-12 (Court, Villa), but insists that physical injury is not an element of an excessive-force claim, see Response at 11.  The Court agrees with Sisneros's basic proposition, but finds that Sisneros has failed to sufficiently allege actual injury.

As the Tenth Circuit recognized in Cortez v. McCauley, "[p]hysical contact is not required for an excessive force claim -- patently unreasonable conduct is."  Cortez v. McCauley, 478 F.3d at 1131.  See Fisher v. City of Las Cruces, 584 F.3d at 897 (stating that Cortez v. McCauley "acknowledged -- and did not overrule -- our prior conclusion that in excessive force cases 'proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element.'"); Martin v. Bd. of County Comm'rs of County of Pueblo, 909 F.2d 402, 406 (10th Cir. 1990).  Instead, Sisneros needs to prove some "actual" injury that is not de minimis.  Fisher v. City of Las Cruces, 584 F.3d at 894.  Sisneros provided evidence that he was placed on the ground with a police officers' knee on his back and/or neck "in an undeveloped area of land with many rocks, weeds, stickers and ants."  Complaint ¶¶ 20-21, at 3.  He further provided evidence that Mr. Fisher "rubbed [Sisneros's] face in the dirt [and] stuck . . . his fingers in [Sisneros's] nostrils,"  Trujillo

Depo. at 24:13-21, while using foul language and treating Sisneros and Trujillo disrespectfully. The Court certainly finds that this use of force could be excessive, and could have caused Sisneros physical trauma, but Sisneros has conceded that his physical injuries are de minimis and that he does not rely on physical injury to support his excessive-force claim. Furthermore, nowhere in the summary judgment evidence that the parties have provided does Sisneros testify that he suffered any psychological trauma, much less any that rises above the de minimis level. He does not testify to any ill-effects resulting from his encounter such as social stigma, nightmares, a need for therapy, or even a new-found distrust of or discomfort around police officers. The most that Sisneros testifies to in his deposition is that, at the time of his encounter with Mr. Fisher, he "thought [he] was going to die," Sisneros Depo. at 48:14-16 (Doc. 40-7). That singular sensation does not provide the requisite "actual injury" necessary to succeed on an excessive-use-of-force claim in the Tenth Circuit. See Silvan W. v. Briggs, 309 Fed. Appx. at 224-25 (finding no excessive force was used when handcuffing for over one hour produced chaffing and soreness of wrists, and victim testified to "extreme emotional trauma"). Sisneros has thus failed to meet his burden of establishing a violation of his Fourth and Fourteenth Amendment rights by Fisher's use of excessive force.

### C.   THE RIGHT TO BE FREE FROM EXCESSIVE FORCE AND THE RIGHT TO BE FREE FROM SEIZURE IN THE ABSENCE OF REASONABLE SUSPICION ARE CLEARLY ESTABLISHED RIGHTS.

The second hurdle that Sisneros must clear to overcome the Defendants' assertion of qualified immunity is to show that the rights about which he alleges violation -- in this case, the right to be free from seizure in the absence of probable cause or reasonable suspicion and the right to be free from excessive force during a seizure -- are clearly established. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327 ("When a defendant asserts qualified immunity at summary judgment, the . . . plaintiff [must] meet a 'heavy two-part burden,' demonstrating, . . . [(ii)] that the

right at issue was clearly established at the time of the defendant's allegedly unlawful conduct.")
(internal citations omitted).  To meet the burden to show that a right is clearly established, a plaintiff
need not find a controlling decision declaring the "very act in question" to be unlawful, Anderson
v. Creighton, 483 U.S. at 640; rather, it is necessary only that "[t]he contours of the right . . . be
sufficiently clear that a reasonable official would understand that what he is doing violates that
right," id. at 635.  See Weigel v. Broad, 544 F.3d at 1154 (stating that the Tenth Circuit "do[es] not
think it requires a court decision with identical facts to establish clearly" the right at issue in the
case).

 Sisneros meets his burden in this case.  The rights to be free from seizure in the absence of
probable cause or reasonable suspicion is beyond question.  See, e.g., Terry v. Ohio, 392 U.S. at 30-
31 (allowing a lesser seizure on the basis of reasonable suspicion); United States v. White, 584 F.3d
at 949 (describing the reasonable suspicion standard); United States v. DeJear, 552 F.3d at 1200
(same); United States v. Maddox, 388 F.3d at 1361 (allowing a reasonable-suspicion seizure);
United States v. Morris, 247 F.3d at 1088 (discussing the requirement of probable cause for an arrest
and defining probable cause).  Likewise, the right to be free from excessive physical force during
the course of an arrest is also clearly established.  See, e.g., Vondrak v. City of Las Cruces, 535 F.3d
at 1208; Cortez v. McCauley, 478 F.3d at 1130-32 (holding that "the level of force the defendants
used against [one plaintiff] was unreasonable in relation to the threat that she presented and the
surrounding circumstances," and finding that the law was clearly established)(citing United States
v. Hensley, 469 U.S. 221, 235 (1985)).  The Court finds that these cases, and many others, define
the scope of reasonable police conduct to an extent that no reasonable officer, behaving in the way
that Sisneros alleges Mr. Fisher acted, could believe that his conduct was lawful.  Ms. Wells
admitted that the rights at issue are well-established.  See Tr. at 8:4-15 (Court, Wells).  Sisneros has

therefore met his "heavy two-part burden," <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d at 1327, and the Court will deny the Defendants' motion for summary judgment on the grounds of qualified immunity as to Sisneros's Fourth-Amendment unlawful-arrest claim. Because he failed to establish a violation as to his excessive-use-of-force claim, however, the Court will grant the Defendants' motion as to that claim.

## II.    A FACTUAL ISSUE EXISTS WHETHER SISNEROS CAN SUCCEED ON HIS STATE-LAW TORT CLAIMS.

Sisneros's third Count alleges various state-law tort claims against Mr. Fisher and, vicariously, against the County. <u>See</u> Complaint ¶¶ 38-42, at 5-6. He alleges that Mr. Fisher "intentionally assaulted, battered, falsely imprisoned, wrongfully arrested, maliciously prosecuted and deprived [Sisneros] of his right to be free from unreasonable search and seizure and excessive force of the . . . New Mexico Constitution[]" while "acting within the scope of his duties as a law enforcement officer." Complaint ¶ 34-35, at 5. The Defendants' only argument for summary judgment on Sisneros's state-law claims is that all of Mr. Fisher's actions were proper, thus they are entitled to summary judgment on both the federal constitutional claims and the state-law claims. <u>See</u> Defendants' Brief at 19-20.[10] Sisneros responds to this argument, however, by insisting that there is evidence supporting the elements of these claims. The Court will therefore address this portion of the Defendants' motion as though it alleged that Sisneros has no evidence to support his state-law claims. The Court largely finds that Sisneros has met his evidentiary burden, but will

---

[10] The Defendants commit a page of their motion to defending against Sisneros's claims of municipal liability against the County on Sisneros's federal claims. <u>See</u> Defendants' Brief at 19. Sisneros, however, asserts his federal constitutional claims against Mr. Fisher only, and does not seek to hold the County liable except under the doctrine of Respondeat Superior as set forth in Count III. <u>See</u> Response at 23. The Court will not address those claims that Sisneros concedes that he does not assert.

partially grant the Defendants' motion.

Municipal entities are often immune from liability in suits by individuals. The Defendants did not assert this immunity, most likely because it has been waived. The NMTCA waives immunity from suit for law-enforcement officers who commit certain intentional torts, including assault, battery, false imprisonment, false arrest, and malicious prosecution -- almost all of which Sisneros asserts. See Lessen v. City of Albuquerque, 144 N.M. 314, 321, 187 P.3d 179, 186 (Ct. App. 2008); NMSA 1978, § 41-4-12 (1976). Thus, as long as Sisneros demonstrates a genuine issue of material fact regarding his state-law claims against Mr. Fisher and the County, those claims survive summary judgment.

New Mexico courts have acknowledged that "the elements of civil and criminal assault and battery are essentially identical." New Mexico v. Ortega, 113 N.M. 437, 440, 827 P.2d 152, 155 (Ct. App. 1992). See N.M.R.A. Civ. UJI 13-1624 Committee Cmt ("It was finally concluded that there was insufficient New Mexico law on [civil] assault and battery . . . to include an instruction in this work."). Under New Mexico law, wherein the Restatement of Torts reigns, one commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." Desmare v. New Mexico, No. CIV 07-0199 JB/RHS, 2007 WL 5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.)(quoting Restatement (Second) of Torts § 18 (1965)). See Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *14 (D.N.M. Mar. 30, 2009)(Browning, J.); Taylor v. Hudson, No. CIV 02-0775 JB/RHS, Court's Instructions to the Jury, Instruction No. 16, at 20, filed December 11, 2003 (Doc. 90)(using standard battery elements for the crime of Battery upon a Peace Officer); NMSA 1978, § 30-3-4 (defining criminal battery); N.M.R.A. Crim. UJI 14-320 (instructing on essential elements

-45-

of criminal battery: intentional touching or applying force to plaintiff, acting in a rude, insolent, or angry manner, and the act occurring at a certain time or place in New Mexico).  New Mexico law defines criminal assault as "an attempt to commit a battery" or "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery."  NMSA 1978, § 30-3-1 (1963).  See N.M.R.A. Crim. UJI 14-301 to 14-303 (instructing on elements of criminal assault).  If Sisneros's testimony is believed and Mr. Fisher is found without justification for his arrest, Mr. Fisher's acts of running up to Sisneros with gun drawn, grabbing Sisneros, and forcing Sisneros to the ground would meet the elements of assault and battery under New Mexico law.  The Court will deny the Defendants' motion for summary judgment as to these claims.

"[F]alse imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so" -- i.e., for an officer, he has no probable cause.  See Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. 84, 88, 173 P.3d 6, 10 (Ct. App. 2007).  Being held to the ground meets these elements, and the existence of probable cause -- "legal authority" -- is a disputed issue.  The Court will deny the Defendants' motion as to this cause of action.

"Malicious abuse of process occurs when (1) a person initiates judicial proceedings against another, (2) he commits an act in the use of process that would not be proper in the regular process of the claim, (3) a primary motive in misusing the process is to accomplish an illegitimate end, and (4) the person against whom the proceedings are initiated suffers damages."  Santillo v. N.M. Dep't of Pub. Safety, 143 N.M. at 88, 173 P.3d at 10.  The second element can be met by showing that judicial proceedings were initiated without probable cause.  See id.  One can initiate judicial proceedings by (i) having and exercising the discretion to bring the judicial proceedings, (ii)

communicat[ing] material information falsely or inaccurately [to] the prosecutor[, who] relies upon"

that information, or (iii) "us[ing] his or her power or position to influence the prosecutor in favor

of prosecution."   Weststar Mortg. Corp. v. Jackson, 133 N.M. 114, 121, 61 P.3d 823, 830

(2002)(quoting, in parenthetical, D. Dobbs, The Law of Torts § 430, at 1216 (2000))(original

alterations omitted).  While there is evidence to the contrary, there is evidence that Mr. Fisher stuck

around after APD arrived and spoke with Kees before Kees initiated his independent investigation.

If Mr. Fisher conveyed his allegedly false version of events to Kees, Kees' investigation may have

been sufficiently tainted for a jury to find that Mr. Fisher was responsible for the initiation of

judicial proceedings against Sisneros.  The Court will therefore deny the Defendants' motion as to

his state-law malicious-abuse-of-process claim.

Finally, New Mexico law applies a reasonableness standard, much like federal law, to

excessive-force claims under the New Mexico constitution.  See Hernandez v. City of Albuquerque,

No. CIV 02-0333 JB/RHS, 2004 WL 3426418, at *2 (D.N.M. Jan. 2, 2004)(Browning, J.)(citing

Campos v. State, 117 N.M. 155, 157, 870 P.2d 117, 119 (1994)).[11]  Likewise, probable cause is

_____

[11] New Mexico appears to have waived immunity for both causes of action under the New
Mexico Constitution.  See NMSA 1978, § 41-4-12 (1976)("The immunity granted pursuant to
[NMSA 1978, 41-4-4(A)] does not apply to liability . . . resulting from . . . deprivation of any rights,
privileges or immunities secured by the constitution and laws of the United States or New Mexico
when caused by law enforcement officers while acting within the scope of their duties.").  See also
Chavez v. City of Albuquerque, 124 N.M. at 482, 952 P.2d at 477 ("Plaintiff may not seek damages
from the City for violation of state constitutional rights unless immunity is waived under the Tort
Claims Act."); Barreras v. N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App.
2002)("In the absence of affirmative legislation, the courts of this state have consistently declined
to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico
Constitution, based on an absence of an express waiver of immunity under the Tort Claims Act.").
Neither party has argued that such claims do not exist under the New Mexico constitution.  See
Campos v. State, 117 N.M. at 157, 870 P.2d at 157 ("All warrantless arrests must comply with the
"reasonableness" component of Article II, Section 10 of the New Mexico Constitution.")(italics in
original).  See also Hernandez v. City of Albuquerque, 2004 WL 3426418, at *2 (discussing the
standards for excessive-force claims under the New Mexico and United States constitutions).

necessary for a valid arrest under New Mexico law.  Moreover, under New Mexico law, an officer also needs exigent circumstances and/or an arrest warrant.  See Campos v. State, 117 N.M. at 157, 870 P.2d at 119 ("For a warrantless arrest to be reasonable it must be based upon both probable cause and sufficient exigent circumstances. Because sufficient exigent circumstances were not present in this case, we reverse.").

An issue exists whether Sisneros's claim of excessive use of force under the New Mexico Constitution requires evidence of a non-de minimis injury.  The Supreme Court of New Mexico's decision in State v. Ellis, 144 N.M. 253, 186 P.3d 245 (2008), implicitly recognized the existence of a civil cause of action for excessive use of force under New Mexico law, but the Court has been unable to locate case law setting forth its precise elements.  See State v. Ellis, 144 N.M. at 258-60, 186 P.3d at 250-52.  The Court does not believe that the Supreme Court of New Mexico would require New Mexico citizens to prove an actual injury to sustain a claim of excessive force.  The New Mexico courts often hold that the New Mexico Constitution provides greater safeguards to its citizens than does the Constitution of the United States.  See State v. Bomboy, 144 N.M. 151, 155, 184 P.3d 1045, 1049 (2008)("Under the New Mexico Constitution, we continue to provide greater protection regarding automobile searches than that provided under the United States Constitution."); Montoya v. Ulibarri, 142 N.M. 89, 96-97, 163 P.3d 476, 483-84 (2007)("[T]he provisions at issue in this case, Article II, Section 18, ensuring due process, and Article II, Section 13, prohibiting cruel and unusual punishment, have been interpreted as providing greater protection than their federal counterparts."); New Mexico Right to Choose/NARAL v. Johnson, 126 N.M. 788, 975 P.2d 841, 850-51 (1998)(declaring a more robust guarantee of equal protection of the law than that provided by the federal constitution).  There is a split amongst the federal circuits whether the United States Constitution -- which New Mexico courts have repeatedly held to provide less protection than its

-48-

own constitution -- requires plaintiffs to establish any particular quantum of injury to sustain an excessive-force claim.  See Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009)("In order to state a claim for the constitutional violation of excessive force, Giardina must establish that an injury occurred that resulted directly from the use of clearly excessive force, and that the excessiveness was unreasonable."); Peterson v. City of Fort Worth, 588 F.3d 838, 846 (5th Cir. 2009)("Our precedent requires that to establish a claim of excessive force, a plaintiff must show that, in addition to being seized, he suffered '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'")(quoting Ballard v. Burton, 444 F.3d 391, 402 (5th Cir. 2006)); Cook v. City of Bella Villa, 582 F.3d 840 (8th Cir. 2009)(noting that "[i]t remains an open question in this circuit whether an excessive force claim requires some minimum level of injury"); Morrison v. Board Of Trustees Of Green Tp., 583 F.3d 394, 406-07 (6th Cir. 2009)(rejecting an argument that, because the injuries inflicted were de minimis, the excessive-use-of-force claim should fail as a matter of law); Gonzalez v. City of Elgin, 578 F.3d 526, 540 (7th Cir. 2009)("[A]lthough evidence of injury can throw some light on the question whether the officers used excessive force, there is no requirement that plaintiffs show any particular degree of injury.")(citing Chelios v. Heavener, 520 F.3d 678, 690 (7th Cir. 2008); Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002)("Force is excessive when an officer's actions are not objectively reasonable in light of the facts and circumstances confronting him.").  The Court believes that the Supreme Court of New Mexico would follow the circuits that have not required the injury to be more than de minimis, and would decline to follow the Tenth Circuit's rule.  Accordingly, the Court finds that an excessive-use-of-force claim under the New Mexico Constitution does not have the same "actual injury" requirement as the corresponding federal claim within the Tenth Circuit, and thus Sisneros's claims of unlawful

arrest and excessive use of force under the New Mexico constitution survive this motion for summary judgment.  A reasonable fact-finder could infer some injury from Sisneros's version of events, at least to Sisneros's dignity, and from being frightened, even if it was for only a short time. While that injury is de minimis under Tenth Circuit law, the Court cannot say it is non-existent under New Mexico law.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted as to Plaintiff Dennis Sisneros's claim for excessive use of force under the United States Constitution. The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Robert R. Cooper
Ryan J. Villa
The Law Offices of Robert R. Cooper
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Deborah D. Wells
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

      *Attorney for the Defendants*